*In re* ESTATE OF LOUISE HENKE, Deceased (Lonnie Henke *et al.*, Petitioners-Appellants, v. Arlene Calvin, Indiv. and as Ex'x of the Will of Louise Henke, Respondent-Appellee).

Fifth District   No. 5—89—0476

Opinion filed September 24, 1990.

David M. Fahrenkamp, of Edwardsville, for appellant.

Robert H. Gregory, of Cox & Gregory, of East Alton, for appellee.

JUSTICE HOWERTON delivered the opinion of the court:
This is a will contest.
Petitioners charge undue influence.
The circuit court of Madison County ruled in a bench trial, and at

the close of petitioners' case, that a *prima facie* case of undue influence had been established; however, after all the evidence had been received and considered, the court found that petitioners had failed to sustain their burden of proving undue influence and entered judgment for respondent.

We affirm.

Louise Henke, the testator, lived with her son, Larman Henke, who was the father of the petitioners.

Louise Henke had a will. It gave her daughter, Arlene, $30,000. Petitioners got the balance, approximately $100,000.

When Larman committed suicide, the testator moved in with her daughter, Arlene.

The morning after Larman's death, Arlene drove her mother to a lawyer's office. The lawyer was not the lawyer who had drafted the original will. There, Louise made a new will.

Under the new will, Arlene was to receive the entire estate.

Petitioners were cut out of the will—each to receive $1.

Two months after the new will was signed, the testator signed a codicil, reaffirming her wish that her grandsons, the petitioners, not share in her estate.

Louise died two years later.

## I

### PRESUMPTIONS AND A *PRIMA FACIE* CASE

The circuit court, at the close of the petitioners' case, found that a *prima facie* case of undue influence had been established.

■ A presumption of undue influence arises when a will contestant shows:

" '(1) a fiduciary relationship between testator and a person who receives a substantial benefit under the will (compared to other persons who have an equal claim to testator's bounty);

(2) a testator in a dependent situation in which the substantial beneficiaries are in dominant roles;

(3) a testator who reposed trust and confidence in such beneficiaries; and

(4) a will prepared or procured and executed in circumstances wherein such beneficiaries were instrumental or participated.' " *Nemeth v. Banhalmi* (1984), 125 Ill. App. 3d 938, 960, 466 N.E.2d 977, 992, quoting *Beyers v. Billingsley* (1977), 54 Ill. App. 3d 427, 436-37, 369 N.E.2d 1320, 1327.

In the case at bar, the evidence established that the testator lived

with Arlene, the beneficiary of the new will. The testator had limited access to outsiders, even having to "sneak visits." The circuit court found that Arlene had considerable influence over the testator, that the testator was totally dependent, and that the testator reposed trust and confidence in Arlene, the beneficiary of the will. The evidence also established that Arlene, the day after Larman died, drove testator to a lawyer to have the will changed.

■■ Although a presumption is still defined as an "inference" (*Bullard v. Barnes* (1984), 102 Ill. 2d 505, 468 N.E.2d 1228), it is a special kind of inference, or logical jump, that the law requires to be made from evidence of one fact to proof of another. Corkery, Presumptions in Civil and Criminal Cases (1985).

A presumption may supply part of the proof necessary to make a *prima facie* case, or it may, as was done here, supply all elements of the cause of action pled, therefore, itself making the *prima facie* case. Corkery, Presumptions in Civil and Criminal Cases (1985).

Thus, whether it forms only part of the proponent's case, or forms all elements of the proponent's cause of action, it shifts the burden of production of evidence by establishing facts which in turn give rise to the inference, or the "presumption," that is required to be made by the law. Corkery, Presumptions in Civil and Criminal Cases (1985).

■■ In the case at bar, the presumption of undue influence was established by the evidence and the reasonable inferences. The circuit court, therefore, was justified in finding that petitioners had made a *prima facie* case.

The burden of production of evidence was shifted to defendants.

## II

### PRESUMPTION REBUTTED

■■ ■ Illinois follows Thayer's "bursting-bubble" theory of presumptions. A presumption may be regarded as a bubble. Each fact necessary to the establishment of a presumption expands the bubble as each fact is produced. Once all facts necessary to the establishment of a presumption have been "blown in," the presumption is fully established. The burden of production of evidence then is shifted to the opponent. If the opponent produces no evidence, then the presumption will carry the day, and the beneficiary of the presumption will be entitled to a directed finding or a directed verdict or judgment, as the case may be. If, however, evidence is introduced that is strong enough to contradict any of the facts which "blow up" the bubble, *i.e.*, the facts upon which the presumption rests, the bubble bursts. The presumption

vanishes. *Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 448 N.E.2d 872.

This does not mean, however, that nothing of evidentiary value is left. Quite the contrary: Inferences still may be drawn from the facts which established the vanished presumption. The difference is this: Whereas an unrebutted presumption will carry the day, a rebutted presumption is reduced to an inference, and the trier of fact is free either to accept the inference, or to believe the evidence that destroyed the presumption and reduced it to a mere inference.

## A

### QUANTUM OF EVIDENCE NECESSARY TO REBUT PRESUMPTION

How much evidence is needed to rebut a presumption and reduce it to a mere inference? It all depends.

■ "The amount of evidence that is required from an adversary to meet the presumption is not determined by any fixed rule. A party may simply have to respond with some evidence or may have to respond with substantial evidence. If a strong presumption arises, the weight of the evidence brought in to rebut it must be great." *Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 463, 448 N.E.2d 872, 877, citing Annot., 5 A.L.R.3d 19, 39 n.14 (1966).

■ In determining the strength of the presumption and, therefore, the quantum of proof necessary to rebut it, the policy underlying the creation of the presumption must be examined. If there are strong policy reasons for the creation of the presumption, it is logical to expect strong evidence to be required to destroy it. Thus, in *Franciscan Sisters*, the supreme court said that the potential for abuse is great where an attorney drafts a will and also stands to benefit from that will. The court then held that as a "matter of public policy *** 'clear and convincing' evidence" was necessary to rebut the presumption of undue influence that was raised by an attorney who drafted a will also receiving under the same will. 95 Ill. 2d at 464-65, 448 N.E.2d at 878.

In the case at bar, we must first determine the quantum of proof necessary to rebut the presumption of undue influence of a daughter over a mother, rather than that of an attorney over a client.

■ We are unaware of any case on point, and so analogize this case to the case of *Rizzo v. Rizzo* (1954), 3 Ill. 2d 291, 120 N.E.2d 546, wherein the supreme court held that a presumption of undue influence arising out of a partnership could only be rebutted by clear and convincing evidence. We believe that if a presumption of undue influence in a partnership case is strong, then a presumption of undue influence

of a daughter over a mother likewise should be strong. Whereas, in *Rizzo*, the influence arose out of a confidential business partnership relationship, in the case at bar, the influence arose not only out of a business-type relationship, but also a family relationship. The confidence reposed seems to be at least as great here as it was in *Rizzo*. Reposal of great confidence can lead to great mischief. The higher the quantum of proof to rebut the presumption, the greater the protection against commitment of mischief. Therefore, we hold that the presumption of undue influence of the daughter over the mother could be rebutted only by "clear and convincing evidence."

## B

### WAS THE PRESUMPTION REBUTTED?

██ In this case, evidence was offered to rebut the presumption. Part of this evidence struck at the existence of a fiduciary relationship, and part at the connection between the will and the circumstances relating to its execution. If clear and convincing evidence rebuts any one of the four elements of a presumption of undue influence as set out above, then the entire presumption is burst, and only an inference remains.

## 1

### FIDUCIARY RELATIONSHIP

██ A fiduciary relationship may be found in one of two ways: (a) from the relationship of the parties, such as an attorney-client relationship; or (b) from the facts of a particular situation, for example, where one reposes trust in another with resulting superiority and influence in the other. *In re Estate of Rothenberg* (1988), 176 Ill. App. 3d 176, 530 N.E.2d 1148.

██ As to the relationship between Arlene and her mother, the testator, a fiduciary relationship does not automatically exist as a matter of law because they were parent and child. (*Pepe v. Caputo* (1951), 408 Ill. 321, 97 N.E.2d 260.) The factors inherent in each case are examined.

Factors which may be considered in determining whether a fiduciary relationship exists are degree of kinship, disparity in age, health, mental condition, and education, and the extent to which a servient party entrusted the handling of her business and financial affairs to a dominant party and reposed faith and confidence in her. Two things must appear: that one party was in fact "servient" and that other

party was "dominant." *In re Estate of Rothenberg* (1988), 176 Ill. App. 3d 176, 180-81, 530 N.E.2d 1148, 1151.

We keep in mind that here we still are involved in analysis of whether the presumption of undue influence was rebutted, and that the evidence in rebuttal was aimed at two elements: (1) fiduciary relationship; and (2) the circumstances surrounding the making of the will. Recitation here of the factors considered in determining a fiduciary relationship or the circumstances surrounding the making of the will should be seen only as a test of the probative values of each piece of rebuttal evidence, and not, here, as a test for the establishment of the presumption of undue influence.

The evidence: Louise Henke managed her own business affairs and continued to do so up until the time of her death; she paid her own bills through the account she maintained at the Bank of Edwardsville; she transacted business with a tenant who farmed her land; she was neither mentally nor physically infirm; and she was characterized by witnesses as a strong-willed individual who knew exactly what she wanted and what she was doing.

2

### SIGNING THE WILL

■■ The mere fact that a beneficiary provides transportation to a law office for a testator raises no presumption whatever of undue influence. *Sloger v. Sloger* (1962), 26 Ill. 2d 366, 186 N.E.2d 288.

Although Arlene and her husband drove her mother to the attorney's office, neither she nor her husband witnessed the signing of the will; they were outside the attorney's private office, in the waiting room. Furthermore, the codicil was executed in the home of her mother's friends and Arlene was not present at this time.

■■ ■ Undue influence must be directly connected with the execution of the will and directed toward procuring the will in favor of a particular party. *Herbolsheimer v. Herbolsheimer* (1977), 46 Ill. App. 3d 563, 361 N.E.2d 134.

We, therefore, scrutinize the execution of the will and the codicil (*Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 448 N.E.2d 872), looking at Arlene's acts, asking if her conduct was directly connected to the making of the will and procuring it in her favor.

Arlene and her husband drove Louise to lawyer Smith's office. Smith testified that they discussed what Louise wanted done, and then when it was clear Louise wanted to draft a will, he asked Arlene and

her husband to go outside and wait in his waiting room. Although Smith's secretary testified that Louise had tears in her eyes, Smith testified that Louise was remarkably calm and not visibly upset.

Smith, who was also Louise's neighbor, testified that Louise expressly wanted to disinherit her two grandchildren, that she was upset with them because she felt they hadn't helped their father enough working on the farm. He also testified that Louise did not especially like her daughter-in-law. After Larman's death, Louise had become involved in a dispute with her daughter-in-law and grandsons over the sale of farm machinery and grain. Although Smith said he had helped resolve the dispute, hard feelings nevertheless had remained.

Smith also testified that Louise was a self-determined woman, who understood her business and was mentally sound at all times, an individual with a good sense of humor. He testified that when Louise first came to see him, the day after her son's suicide, he tried to convince her that the time to execute a will was not right, but she was adamant: The will would be made.

Smith said:

> "And her thought was then, and this is how sharp I think she was. She said, 'They didn't come to see me when I was alive so I don't want them seeing me laying in the coffin.' Very precise lady, I think."

Smith suggested that she think about it and at a later date have a codicil executed.

Louise did just that. She thought about it and two months later had a codicil drafted indicating that she still wished to give her entire estate to her daughter, Arlene. This codicil was signed and witnessed at the home of Gene and Ruth Meyer, friends of Louise. Smith's secretary drove Louise to the home of her friends for the signing of the will. Neither Arlene nor her husband was present at this signing.

We believe the presumption was rebutted by the presentation of this contrary evidence. The evidence was sufficient to rebut both the fiduciary relationship as well as the circumstances under which the will was signed, both of which are but two of four elements of the presumption.

The bubble burst.

## III

### MANIFEST WEIGHT

■■ A presumption shifts the burden of production, not the burden of persuasion.

Sufficient evidence, therefore, having been presented to rebut the presumption of undue influence as a matter of law, there remained the determination of the case by the trier of fact, by weighing the evidence and considering all reasonable inferences that could be drawn from these facts, including the possible inference of undue influence. Once the presumption had been rebutted, the trier of fact had to weigh, to assess the evidence, and decide the case. *Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 466, 448 N.E.2d 872, 878.

The circuit court did precisely that, and in making that determination necessarily considered the credibility of the witnesses.

We can only review that decision, by the manifest weight of the evidence standard. Applying that standard, we hold that his decision is not against the manifest weight of the evidence.

## IV

■■■ Lastly, petitioners argue that the circuit court erred in allowing lawyer Smith to testify, because he was directly interested in this action, and they rely on the Dead Man's Act (Ill. Rev. Stat. 1985, ch. 110, par. 8—201).

The Dead Man's Act provides, in pertinent part:

"In the trial of any action in which any party *** defends as the representative of a deceased person *** no *** person directly interested in the action shall be allowed to testify on his *** own behalf ***." Ill. Rev. Stat. 1985, ch. 110, par. 8—201.

Petitioners maintain that Smith had a direct interest in this action because he owned property adjoining the testator and had discussed purchasing the testator's land from Arlene after the testator's death.

Respondents claim that Smith was not directly interested in the action and did not testify on his own behalf, but rather was called as a witness for the estate to testify to testamentary capacity.

The court *voir dired* Smith and concluded that Smith's interest in possibly buying the land was not a current or direct interest and was minimal.

The issues raised by the express language of the Dead Man's Act, therefore, are two. First, did lawyer Smith testify "on his own behalf"? Second, was lawyer Smith a "person directly interested in this action"?

As to the first issue, Smith did not testify in his own behalf. He was not a party. He was called to testify by Arlene.

■■■ As to the second issue, in a will contest, the test of "interest" is whether the witness will gain or lose as the direct result of the suit, and the rule is that such interest must be certain, direct, and im-

mediate. (*Latham v. Rishel* (1943), 384 Ill. 478, 51 N.E.2d 531; *Brownlie v. Brownlie* (1932), 351 Ill. 72, 76, 183 N.E. 613, citing *Wetzel v. Firebaugh* (1911), 251 Ill. 190.) The disqualifying interest must be actual, in being, and not a mere belief, understanding or feeling in regard to such interest. *Brownlie*, 351 Ill. at 76, citing *Pyle v. Pyle* (1895), 158 Ill. 289, 41 N.E. 999.

Here there was no direct interest. Inquiry about buying property is seeking information, an act on a par with "mere belief, understanding or feeling." No direct interest can be imputed; after all, lawyer Smith might have found it easier to have bought the land from petitioners rather than from Arlene. Indulgence in speculation is required in order to find an interest that would cause disqualification of Smith by the Dead Man's Act.

The circuit court, therefore, properly admitted the testimony of Smith.

The circuit court is affirmed.

Affirmed.

WELCH and GOLDENHERSH, JJ., concur.